United States Court of Appeals
For the Eighth Circuit
_____

No. 19-2386
_____

United States of America

*Plaintiff - Appellee*

v.

Paul R. Hansmeier

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 23, 2020
Filed: February 10, 2021
_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge

    Paul Hansmeier was charged in an 18-count indictment with mail and wire fraud, 18 U.S.C. §§ 1341, 1343; conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; conspiracy to commit money laundering, 18 U.S.C. § 1956(h); and

Appellate Case: 19-2386    Page: 1    Date Filed: 02/10/2021 Entry ID: 5003179

conspiracy to commit and suborn perjury, 18 U.S.C. § 371. After the district court[1] denied his motion to dismiss the 17 fraud and money laundering counts, Hansmeier pleaded guilty to one count of conspiracy to commit mail and wire fraud and one count of conspiracy to commit money laundering. He was sentenced to 168 months' imprisonment and ordered to pay restitution in the amount of $1,541,527.37.

Hansmeier presents two arguments on appeal. First, he claims that the district court erred in denying his motion to dismiss. Second, he contends that the district court's restitution award improperly included more than just the losses caused by his offense. We affirm.

I.

A.[2]

Paul Hansmeier was an attorney licensed to practice law in Minnesota. Along with his business partner John Steele, who was charged in the same indictment,[3] Hansmeier operated the law firm Steele Hansmeier PLLC. Beginning around

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2]Though both Hansmeier and the government have offered additional factual context in their presentations before this court, our analysis of Hansmeier's motion to dismiss is limited to what is contained in the indictment. United States v. Steffen, 687 F.3d 1104, 1107 n.2 (8th Cir. 2012) ("In reviewing the sufficiency of an indictment, we accept the government's factual allegations as true, without reference to allegations outside the indicting document." (quoting United States v. Farm & Home Sav. Ass'n, 932 F.2d 1256, 1259 n.3 (8th Cir. 1994))). Accordingly, the following description of Hansmeier's conduct is drawn from the indictment that forms the basis of our review and takes the facts alleged in the indictment as true. Cf. id. (drawing "the facts set forth in [the] opinion . . . from the indictment").

[3]Steele pleaded guilty to both conspiracy counts in March 2017 and was sentenced to a prison term of 60 months.

September 2010, the firm started representing organizations and individuals that owned the copyrights to certain pornographic movies. As part of their representation, Hansmeier and Steele pursued the following strategy, as described in the indictment:

> Defendants and their agents monitored file-sharing websites and obtained IP Addresses of individuals who downloaded or attempted to download their clients' movies. Defendants then filed copyright infringement lawsuits against these anonymous individuals, sometimes referred to as "John Does," and sought authority from the court—often referred to as "early discovery"—to subpoena internet service providers for subscriber information associated with the IP Addresses.
>
> After receiving the subscriber information, defendants . . . made phone calls and sent letters to the subscribers associated with targeted IP Addresses in which they threatened overwhelming financial penalties—the copyright statute permits plaintiffs to recover damages of up to $150,000 per infringement—and public disclosure unless the purported infringers agreed to pay a settlement of approximately $4,000. Many of the individuals who received defendants' letters and phone calls agreed to pay the settlement rather than incur the expense of defending the lawsuit—which would undoubtedly exceed the settlement amount—or risk being publicly shamed for allegedly downloading pornographic movies.

The indictment alleges that Hansmeier and Steele started by monitoring file-sharing websites to look for potential infringers. Beginning in April 2011, however, the two men began directing their agents "to upload their clients' pornographic movies to BitTorrent file-sharing websites, including a website named the Pirate Bay, in order to entice people to download the movies and make it easier to catch those who attempted to obtain the movies." Once Hansmeier and Steele identified potential infringers who downloaded the movies, they took the same steps of seeking early discovery, sending settlement demands, and receiving payments from alleged infringers. Hansmeier and Steele told neither the courts in which they sought discovery nor the alleged infringers that they were responsible for making the films available on the file-sharing sites.

Several months later, Hansmeier and Steele again modified their strategy. First, in November 2011, they "caused Prenda Law to be created." Though the firm was nominally owned by their associate, the two men exerted de facto control over it and used the firm to pursue their copyright infringement litigation. The indictment alleges that Hansmeier and Steele "on multiple occasions falsely denied to various courts any direct involvement with or control over Prenda Law." Next, they created the organizations AF Holdings and Ingenuity 13. Hansmeier and Steele represented to the courts that these organizations were owned and controlled by other individuals and used the names of an acquaintance and of a paralegal they employed. But in reality, Hansmeier and Steele controlled both. Under their direction, these organizations obtained copyrights to a number of pornographic films and then served as Hansmeier and Steele's clients as the two men pursued their copyright litigation. Unknown to both the courts and the alleged infringers, Hansmeier and Steele were thus the direct beneficiaries of all settlement payments made out to AF Holdings and Ingenuity 13.

In May 2012, Hansmeier and Steele began creating pornographic films themselves. Contracting with adult film actresses, Hansmeier and Steele produced multiple short films and transferred the copyrights to Ingenuity 13. They did not distribute the movies commercially, but instead posted them exclusively on file-sharing websites and monitored the downloads. Using these entities and films, Hansmeier and Steele continued to pursue their settlement-focused litigation strategy. In doing so, they failed to disclose their involvement to either the courts or the alleged infringers.

The indictment alleges that, in order to carry out their litigation strategy, Hansmeier and Steele deceived both the courts in which they sought discovery and the alleged infringers they sued. Specifically, the indictment accuses Hansmeier and Steele of deliberately concealing from the courts "their role in distributing the movies, as well as their significant personal stake in the outcome of the litigation." This concealment, the indictment alleges, was done with the purpose of gaining access to downloaders' identifying information, in order to "garner quick settlements

from individuals who were unaware of the defendants' role in uploading the movie, and often either too embarrassed or could not afford to defend themselves." The indictment also characterizes the threatened lawsuits as legally baseless, suggesting that Hansmeier and Steele had provided legal authorization to download the movies when they caused them to be uploaded to file sharing sites. Accordingly, the indictment claims, any representations Hansmeier and Steele made to the courts or the alleged infringers that they and their clients had legitimate copyright infringement claims or had suffered damages from that infringement were also false.

Around October 2012, "after courts had begun limiting the discovery [they] could obtain through copyright infringement suits," Hansmeier and Steele developed a new way to seek copyright settlements. This involved the creation of three new organizations: Guava, Livewire Holdings, and LW Systems. As with AF Holdings and Ingenuity 13, though Hansmeier and Steele represented that these companies were owned by other individuals, Hansmeier and Steele actually controlled each company. Under their new strategy, Hansmeier and Steele filed lawsuits alleging that certain John Does had hacked these companies' computer systems. This, the indictment claims, was a lie: while the John Does in question had apparently downloaded the pornographic films, they had not hacked into any computer systems. Indeed, the companies had no computer systems to hack.

In reality, according to the indictment, Hansmeier and Steele brought these lawsuits in a renewed attempt to learn the identities of alleged infringers and to send them settlement demands. In this effort, Hansmeier and Steele recruited "ruse defendants." These defendants were people Hansmeier and Steele had caught downloading movies for which they (or their purported "clients") possessed copyrights. In exchange for Hansmeier and Steele waiving their copyright claims against them, the ruse defendants agreed to be sued for hacking the companies' computer systems. This then allowed the two men to seek discovery about the ruse defendants' alleged co-conspirators in the computer hacking. In reality, these "co-conspirators" were just other downloaders of copyrighted movies whose IP addresses Hansmeier and Steele identified through the file sharing sites. Once

Hansmeier and Steele gained subpoena authority for the supposed co-conspirators' information, they sent them the same copyright-based settlement demands described above.

Eventually, courts grew suspicious of Hansmeier and Steele's litigation techniques and started denying their subpoena requests, dismissing their lawsuits, imposing sanctions, and notifying state attorney disciplinary bodies and other courts. The indictment includes language from a federal district court order imposing sanctions against both men, in which the court states that the two "have demonstrated their willingness to deceive not just this Court, but other courts where they have appeared" and that their "deception was calculated so that the Court would grant [their] early-discovery requests, thereby allowing [them] to identify [alleged copyright infringers] and exact settlement proceeds from them." The responses from the courts effectively ended Hansmeier and Steele's operation. But between 2011 and 2013, before they faced this increased scrutiny, Hansmeier, Steele, and their entities received more than $6 million in copyright settlement payments, half of which went to Hansmeier and Steele themselves.

B.

On December 14, 2016, a federal grand jury charged Hansmeier and Steele with conspiracy to commit wire and mail fraud; multiple instances of mail and wire fraud between December 2011 and April 2013; conspiracy to commit money laundering; and conspiracy to commit and suborn perjury. Hansmeier moved to dismiss all but the perjury count, arguing that the facts alleged did not constitute criminal fraud. See Fed. R. Crim. P. 12(b)(3)(B) (authorizing pretrial challenges to indictments that "fail[] to state an offense").[4] The magistrate judge recommended the motion be denied, and the district court adopted the recommendation.

---

[4]Because the theory of money laundering charged was premised on Hansmeier and Steele committing mail and wire fraud, this count was included in the motion to dismiss.

-6-

Appellate Case: 19-2386     Page: 6     Date Filed: 02/10/2021 Entry ID: 5003179

Following the district court's order, Hansmeier entered into a conditional plea agreement with the government, pleading guilty to one count of conspiracy to commit mail and wire fraud and one count of conspiracy to commit money laundering, reserving the right to appeal the denial of his motion to dismiss.

At sentencing, the district court heard evidence about restitution. In support of its proposed restitution amount, the government called Jared Kary, a special agent with the FBI. Agent Kary described Hansmeier and Steele's settlement strategy, explaining that the settlements their targets agreed to pay typically "ranged between $2,500 and $3,400," though were sometimes lower. Based on his review of Hansmeier and Steele's financial documents, Agent Kary estimated that, between 2010 and 2013, the alleged infringers Hansmeier and Steele targeted paid over $6 million total in settlements. Agent Kary then summarized a spreadsheet the FBI created to estimate the proper restitution amount. The spreadsheet did not include all of the settlement money that came in over this time period. Rather, it was limited to payments made after April 2011, which is when there was evidence that Hansmeier and Steele posted to file-sharing websites a movie to which they held the copyright—in other words, when, under the government's theory, their fraud scheme began—and to payments that he could link to specific victims. Based on these parameters, he calculated a restitution figure of $1,541,527.37.

Hansmeier objected to this calculation on the basis that the FBI's spreadsheet did not distinguish between settlement payments that came from "legitimate lawsuits" and those that came from fraudulent ones. The court found the defense's arguments unconvincing, noting "there does not appear from the testimony and from the facts admitted at the plea . . . any more than potentially a negligible amount of what could be reasonably considered money coming from a source other than the overall fraudulent scheme. And so this is a pretty conservative restitution amount." The court ultimately accepted the government's evidence and imposed restitution in the amount of $1,541,527.37.

Hansmeier now appeals.

II.

We review de novo a defendant's motion to dismiss an indictment for failure to state an offense. See United States v. Steffen, 687 F.3d 1104, 1109 (8th Cir. 2012). In doing so, we accept the allegations stated in the indictment as true, Farm & Home Sav. Ass'n, 932 F.2d at 1259 n.3, and ask whether they can form the basis of the charged offense. See United States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009) ("An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." (quoting United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008))). A slightly greater level of detail is required for the bank, mail, or wire fraud statutes, for which an indictment must "specify facts . . . with such reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation and as will enable the court to say that the facts stated are sufficient in law to support a conviction." Steffen, 687 F.3d at 1113 (cleaned up). The question of whether the facts alleged in an indictment adequately state an offense therefore turns on the elements of that offense. See United States v. Flute, 929 F.3d 584, 587 (8th Cir. 2019).

The mail and wire fraud statutes at issue here prohibit the use of interstate mail or wire facilities to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. As Hansmeier notes, the term "scheme to defraud" initially may seem slightly amorphous. See, e.g., United States v. Britton, 9 F.3d 708, 709 (8th Cir. 1993) (per curiam) (defining a scheme to defraud as "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community" (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987))). But cases from this circuit and the Supreme Court have offered more concrete guidance on what the mail and wire fraud statutes require.

-8-

To prove the existence of a fraudulent scheme, the government must establish: "(1) there was a deliberate plan of action or course of conduct to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was to get someone else to act on it." United States v. Luna, 968 F.3d 922, 926 (8th Cir. 2020) (cleaned up). As this definition indicates, for criminal liability to attach, a scheme to defraud must consist of *material* misrepresentations: misrepresentations that have "a natural tendency to influence, or [are] capable of influencing, the decision of the decisionmaking body to which [they are] addressed." United States v. Heppner, 519 F.3d 744, 749 (8th Cir. 2008) (quoting Preston v. United States, 312 F.3d 959, 960 (8th Cir. 2002) (per curiam)); see also Luna, 968 F.3d at 926 ("To defraud someone requires material, affirmative misrepresentations or active concealment of material information for the purpose of inducing action."). However, a scheme to defraud need not involve affirmative lies.

While nondisclosure of a relevant fact, "characterized by mere silence," is not enough for fraud, active concealment—"deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter"—can form the basis of a fraudulent scheme. Steffen, 687 F.3d at 1114 (quoting United States v. Colton, 231 F.3d 890, 898–99 (4th Cir. 2000)); see also United States v. Kidd, 963 F.3d 742, 751 (8th Cir. 2020) (recognizing that "evidence of active concealment could prove a scheme to defraud"). Finally, though fraud necessarily involves misrepresentations made with the "object" of obtaining money or property from victims, Kelly v. United States, 140 S. Ct. 1565, 1572 (2020), it is not the case that the victims targeted must be the direct recipients of the materially deceptive statement or concealment, see Kidd, 963 F.3d at 749 ("The gravamen of the offense is not a false representation *to a victim*, but the development of a scheme to defraud." (emphasis added)). Rather, we have held that the misrepresentations may be made to third parties, where the third parties are used to further the scheme to defraud the ultimate victims. See, e.g., United States v. Blumeyer, 114 F.3d 758, 768 (8th Cir. 1997) (recognizing a scheme to defraud where the defendant made false representations to a regulatory agency with the goal that the agency's actions would bolster his "scheme to obtain money or property from others").

-9-

Hansmeier's indictment identifies two related litigation strategies that Hansmeier and Steele employed between late 2011 and 2013 and that form the basis of the government's fraud allegation. Both meet the elements of a fraudulent scheme. In the first, Hansmeier and Steele brought copyright infringement lawsuits and requested discovery on behalf of their supposed clients seeking the identities of alleged copyright infringers but did not disclose (1) that they directed agents to make the copyrighted works available on websites known for illegal downloading; and (2) that the clients were in fact companies that Hansmeier and Steele set up in order to personally profit from anticipated settlements. On its face, this alleged conduct meets the elements required for a fraudulent scheme. See Luna, 968 F.3d at 926. By posting the movies, Hansmeier and Steele took steps to ensure that they would have a pool of potential copyright infringers to target through litigation. And by having separate companies that they controlled act as their clients, they obscured their personal and financial involvement in those lawsuits. Hansmeier and Steele's choice to conceal from the courts their full involvement in the lawsuits thus constitutes a "deliberate plan of action . . . to hide or misrepresent information." Id. at 926.

The information they misrepresented was also material. Had the courts known that Hansmeier and Steele intentionally posted the films on websites used for illegal file sharing or that the two men were in fact the personal beneficiaries of their "clients'" copyright claims, they would have treated the subpoena requests with far greater skepticism—indeed, the indictment alleges that Hansmeier and Steele faced dismissals of their lawsuits and sanctions when the extent of their involvement eventually came to light. See Heppner, 519 F.3d at 749. That Hansmeier and Steele created multiple organizations under the names of their associates in order to pursue litigation, rather than naming themselves as the copyright holders, itself suggests that they knew how relevant the courts would find this information. And the courts' skepticism about Hansmeier and Steele's level of personal involvement and financial interest in the litigation would have been likely even if, as Hansmeier argues, their claims did involve actionable copyright infringement. Cf. Luna, 968 F.3d at 927

-10-

Appellate Case: 19-2386     Page: 10     Date Filed: 02/10/2021 Entry ID: 5003179

(holding that, in an insurance fraud case, it did not matter whether some of the claims may have been independently valid, because "with a fuller picture of the clinic's practices, insurers would have investigated" and that "[t]his fact alone shows that the information withheld had a tendency to influence their actions, even when it had no effect on whether they ultimately paid").

Finally, the indictment makes clear that the purpose of Hansmeier and Steele's concealment was to induce the courts to act, in the form of granting their subpoena requests. And the ultimate object of those requests—and the deceptive tactics leading up to them—was to obtain settlement payments from a pool of alleged infringers. Putting the different elements together, the indictment alleges that Hansmeier and Steele (1) developed and executed a plan that depended on them (2) deliberately concealing material information from the courts, (3) with the purpose of convincing those courts to grant their discovery requests and (4) with the ultimate object of obtaining settlement payments from alleged infringers they identified through those discovery requests. This conduct meets the elements of criminal fraud.

The second litigation strategy utilized by Hansmeier and Steele, which began in the fall of 2012, shared many features of the first, including the use of discovery to obtain identifying information for alleged infringers and the deployment of that information to then obtain settlement payments. While the second approach similarly involved misleading courts by concealing material information in order to subpoena downloaders' identifying information, Hansmeier and Steele also began actively lying to the courts. As the indictment describes, the two men falsely accused a number of "ruse defendants" of hacking into their clients' systems and, through these false accusations, convinced the courts to provide them with the requested discovery. Thus, and for the same reasons outlined above, the indictment's presentation of Hansmeier and Steele's conduct involving ruse defendants is sufficient to support fraud charges—the only difference is that the deception there came in the form of affirmative misrepresentations.

-11-

In sum, the conduct recounted in the indictment constitutes a "scheme . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. Taking its allegations as true, the indictment lays out a sufficient basis for the government's charge that Hansmeier committed fraud, and it informs the court and the parties involved of the facts underlying that charge. This is what is legally required of an indictment. See Steffen, 687 F.3d at 1113. In his defense, Hansmeier was free to dispute the facts, offer alternative explanations for his conduct, or provide context to any of the actions alleged. In short, it was Hansmeier's right to present any lawful defense available to him against the government's effort to prove his guilt beyond a reasonable doubt. But Hansmeier's possible defenses are not relevant to our consideration of whether the indictment itself properly stated the basis for the charged offenses.[5] Because the facts in the indictment, accepted as true, describe a fraudulent scheme prohibited by federal law, Hansmeier cannot succeed in his claim that it is facially insufficient. We affirm the district court's denial of his motion to dismiss.

## III.

Hansmeier also argues that the district court's award of $1,541,527.37 in restitution violated the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Specifically, he claims that the district court erred in relying on a

---

[5]Disputing this conclusion, Hansmeier invokes the metaphor of a three-legged stool, arguing that, because none of the independent "legs," viewed on its own, involves him lying to or concealing information from his ultimate victims, the theory of fraud laid out in the indictment fails. Even assuming this characterization of his conduct is accurate, there is no authority suggesting that courts should approach fraud charges in this fragmented manner. Indeed, such an approach would risk allowing more sophisticated fraudulent schemes, which may involve multiple, independently legal acts or falsehoods aimed at providing the perpetrators with legal or regulatory authority to pursue their victims, to go unchecked. Cf. Kidd, 963 F.3d at 747–50 (insurance fraud orchestrated by a licensed chiropractor); Blumeyer, 114 F.3d at 766–68 (fraud committed by defendant who owned several insurance companies).

calculation that included not just losses by victims of the fraud scheme, but also "legitimate" settlement payments from the same period (i.e., those paid by people who downloaded copyright-protected movies posted on file-sharing websites by people other than Steele and Hansmeier).

The government first responds that Hansmeier waived any right to challenge the application of the MVRA in the terms of his plea deal. The agreement specifies:

> Defendant understands and agrees that the Mandatory Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order the defendant to pay the maximum restitution to the victims of his crimes as provided by law. The defendant understands and agrees that the Court will order him to make restitution for the entire loss caused by his fraud scheme and that the restitution order will not be limited to the counts of conviction.

We do not read this provision as a waiver of Hansmeier's right to appeal the restitution award. Nor is it a pledge to pay the "$3 million in fraudulent proceeds" identified elsewhere in the agreement. Unlike in the cases on which the government relies, Hansmeier did not agree to pay "any restitution ordered by the District Court," United States v. Lester, 200 F.3d 1179 (8th Cir. 2000), or agree to pay restitution "up to" a certain amount, United States v. Bartsh, 985 F.2d 930 (8th Cir. 1993). Here, Hansmeier simply agreed that the MVRA would apply and that the court would order him to pay restitution. He did not, in doing so, waive his right to challenge any perceived error in the ultimate restitution amount imposed. Cf. United States v. Polukhin, 896 F.3d 848, 852 (8th Cir. 2018) (holding that defendant did not waive her right to appeal restitution when she made no agreement to pay whatever the court ordered).

Because Hansmeier did not waive the issue, we will "review the district court's decision to award restitution for an abuse of discretion and the district court's

finding as to the amount of loss for clear error." United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011).[6]

The MVRA requires that sentencing courts order restitution in all cases where "an identifiable victim or victims has suffered a physical injury or pecuniary loss" "as a result of the commission of an offense." 18 U.S.C. § 3663A(a), (c). Restitution "must be based on the amount of loss actually caused by the defendant's offense," and the burden is on the government to "prove that the restitution awarded does not exceed the actual, provable loss caused by the offense." United States v. Fonseca, 790 F.3d 852, 854 (8th Cir. 2015). In fraud cases, restitution "may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme." United States v. Farrington, 499 F.3d 854, 860 (8th Cir. 2007) (quoting United States v. Ross, 279 F.3d 600, 609 (8th Cir. 2002)). However, the actual loss requirement means that courts must be wary of over-inclusiveness—and particularly of setting payment amounts that encompass both losses caused by the fraud at issue and legitimate payments separate from the fraudulent scheme. See Luna, 968 F.3d at 930. But see United States v. Karie, 976 F.3d 800, 806 (8th Cir. 2020) ("Where a defendant's dealings are systematically tainted with fraud, a district court may determine that the total amount of payments equals the loss amount." (cleaned up)).

Here, the government met its burden of showing by a preponderance of the evidence that the $1,541,527.37 loss total was attributable solely to settlement payments from the fraud scheme. See United States v. DeRosier, 501 F.3d 888, 896

---

[6]Hansmeier argues that the appropriate standard of review is de novo. However, de novo review applies only "to the extent the district court interpreted the [MVRA] to determine its obligations in awarding restitution." Frazier, 651 F.3d at 903. Here, the district court's restitution decision did not involve a legal interpretation of the MVRA. Rather, the primary question before the district court was factual: how to determine whether payments sent to Hansmeier and Steele after April 2011 were from fraud victims or from alleged copyright infringers paying settlements in "legitimate" lawsuits. The district court's decision to rely on the calculation provided by the government is therefore subject to clear error review.

(8th Cir. 2007) ("The burden is on the government to prove the amount of restitution based on a preponderance of the evidence."). The figure was based on calculations Agent Kary presented to the court at the sentencing hearing. In coming to his final loss amount, Agent Kary included only settlement payments from April 2011 on, when Hansmeier and Steele directed an associate to upload a movie called Sexual Obsession, which they held the copyright to and which they used in their fraudulent lawsuits, to file sharing websites. Agent Kary explained that Sexual Obsession became the "go-to movie as far as gaining settlements from individuals." He said that other movies were not a "significant" source of profit from that point on, constituting just "a few [payments] trickling in here and there." Considering this information, the district court characterized potential payments from "legitimate" lawsuits over this period as making up no "more than potentially a negligible amount" of the money Hansmeier and Steele received. Cf. Karie, 976 F.3d at 806.

Agent Kary further attempted to narrow his calculation to payments from fraud victims by excluding any payments that came in over this period that he could not tie to a specific person—suggesting that his estimate might in fact have been under-inclusive of the total amount Hansmeier and Steele received from their fraud scheme. Agent Kary also showed his list of identified victims to Steele, who confirmed that only one or two names were not those of fraud victims. Finally, Hansmeier himself acknowledged in his plea agreement that, between 2011 and 2014, he and Steele "received more than $3,000,000 in fraudulent proceeds" from their lawsuits.

In light of the information the government presented at sentencing, the district court did not clearly err in concluding that the $1,541,527.37 figure was fairly representative of the actual loss caused by the fraudulent scheme.

IV.

We affirm the judgment of the district court.

_____

-15-

Appellate Case: 19-2386     Page: 15     Date Filed: 02/10/2021 Entry ID: 5003179